973 So.2d 1022 (2008)
Arthur WOODS, Appellant
v.
STATE of Mississippi, Appellee.
No. 2006-KA-00417-COA.
Court of Appeals of Mississippi.
January 29, 2008.
*1024 James H. Arnold, attorney for appellant.
Office of the Attorney General by Jeffrey A. Klingfuss, attorney for appellee.
BEFORE KING, C.J., CHANDLER AND CARLTON, JJ.
CHANDLER, J., for the Court:
¶ 1. Arthur Woods was indicted on two counts of statutory rape. In December 2005, a Leflore County jury found Woods guilty of one count of statutory rape, and the court sentenced him to thirty years in the custody of the Mississippi Department of Corrections. He asserts the following issues on appeal:
1. The prosecution committed misconduct in having the witnesses vouch for the truthfulness of the complainants' allegations of statutory rape.
2. The trial court erred in refusing to allow the defense to play a prior consistent statement made by Amy.
3. The trial court erred in allowing the prosecution to cross-examine Amy with her grand jury testimony where the testimony was not provided to the defendant.
4. The trial court erred in allowing the prosecution to elicit hearsay.
5. The prosecution committed misconduct when it vouched for its case in closing argument.
6. The evidence is insufficient to support the verdict or, in the alternative, the verdict is against the overwhelming weight of the evidence.
7 The errors taken together are cause for a new trial.
¶ 2. We find no error and affirm Woods's conviction and sentence.

FACTS
¶ 3. On October 15, 2003, an eighth grade science teacher intercepted a note being passed between two female students, *1025 Amy and Katrina.[1] The teacher was disturbed by what she read and showed, the note to Amy's mother, who worked at the school. Amy's mother showed the note to Katrina's father and stepmother, who promptly called the sheriff. Lenore County Sheriffs Deputy Donald Radford came to Katrina's house and was shown the note. Deputy Radford subsequently took Woods into custody. Investigator Theodore White took a statement from Amy, but. Katrina was too upset to give a statement.
¶ 4. At the trial, both Amy and Katrina testified. Each admitted to having written a portion of the note. Katrina testified that both girls had sex with Woods at his home on the night of October 10, 2003. Katrina testified that Amy spent the night at Katrina's house that night. Katrina stated that, after her parents went to bed, the two sneaked out of the house and went to Woods's house across the street. Woods let them in. Katrina testified that she and Amy watched television in the kitchen for about five minutes. During this time, Woods answered a knock at his door and Katrina heard him speaking with men she identified as Curtis Johnson and Willie Ray. Katrina stated she did not know if Curtis and Willie stayed at the house or departed. Katrina testified that she and Amy went to Woods's bedroom. According to. Katrina, she had sex with Woods and then Amy had sex with Woods. Katrina testified that Woods had sex with each of them twice. On the night in question, Amy was fifteen years of age and Katrina was fourteen; Woods was fifty-one years old.
¶ 5. Katrina further testified that she loved Woods and did not want anything to happen to him. On cross-examination, Woods impeached Katrina with her prior statements to Woods's investigator denying sex with Woods. Katrina gave a sworn statement saying that she never had sex with Woods. In another statement Katrina claimed to have never had sex with anyone over age thirty. Katrina maintained she gave these statements in an attempt to avoid having to testify. However, she admitted having told Amy that her stepmother had threatened to put her out of the house if she did not testify that she had sex with Woods.
¶ 6. Shortly before trial, the State received word that Amy was going to recant her prior statement to Deputy White implicating Woods. Nonetheless, Amy testified on behalf of the State with no objection from Woods. Amy testified that she did not have sex with Woods. She stated that when she and Katrina went to Woods's house, they were accompanied by Willie and Curtis. The State impeached Amy with the note and with her prior statement to Deputy White, relating that she and Katrina had sex with Woods in his bedroom. According to that statement, Woods had sex with Amy first and then Katrina, and he had sex with each girl twice. In the statement, Amy communicated that Woods had worn a condom during each sexual encounter with her, but in the note, Amy stated that Woods had not worn a condom during one of the encounters. Amy expressed concern in the note that she could be pregnant. When confronted with her prior statements, Amy asserted that she had been playing when she wrote the note and gave the statement to Deputy White in response to pressure from her mother to admit the sex occurred. She contended that she never had *1026 sex with Woods and that her testimony was truthful.
¶ 7. Amy's mother testified for the defense. She testified that Katrina had said her stepmother would put her out of the house if she did not say she had sex with Woods. Amy's mother testified that she told Katrina to tell the truth during her testimony, and Katrina responded that if she told the truth, she would have nowhere to live. Curtis Johnson testified that, in October 2003, he went to Woods's house with Willie, Katrina, and Amy. Johnson stated that, during this visit, the girls were not out of his sight long enough to have engaged in any sexual activity with Woods. However, Johnson admitted that he did not know the date of this visit and that the girls could have been in the house during his other visits with Woods and he might not have known they were present. Woods's girlfriend testified that she and Woods were together in the bedroom on the night of October 10, 2003, when she heard male and female voices coming from the front of the house.
¶ 8. Due to insufficient evidence, the court dismissed Count I, the statutory rape of Amy. The jury found Woods guilty of Count II, the statutory rape of Katrina.

LAW AND ANALYSIS
1. The prosecution committed misconduct in having the witnesses vouch for the truthfulness of the complainants' allegations of statutory rape.
¶ 9. In its case-in-chief, the State on several occasions asked its witnesses to give an opinion on whether or not Katrina was being truthful when she stated that she and Amy had sex with Woods. On each occasion, the trial court sustained Woods's objection to this testimony. For example, the prosecutor asked Katrina's stepmother, "Can you tell when she's lying to you or when she's telling the truth." Woods objected, but the stepmother answered affirmatively before Woods's objection was sustained. Also, the stepmother indicated, upon questioning, that she believed Katrina. The court sustained Woods's objection to that testimony as well. The prosecution asked similar questions' of Katrina's father and of Deputy Radford, but the court likewise sustained objections to these witnesses' opinions on truthfulness. Katrina's father did not answer the question. However, before the objection was sustained, Deputy Radford opined that Amy and Katrina were telling the truth about the sex on the night he questioned them.
¶ 10. "[O]pinion testimony as to a witness's truthfulness is of dubious competency." Williams v. State, 539 So.2d 1049, 1051 (Miss.1989). Therefore, an opinion by one witness as to another's veracity is "generally inadmissible." Smith v. State, 925 So.2d 825, 838-39(¶ 32) (Miss.2006). Therefore, the trial court properly sustained Woods's objections to the State's attempt to elicit opinions on the truthfulness of Amy and Katrina's statements from various other witnesses. Though the objections were sustained, Woods complains that the prosecution's repeated attempts to elicit this impermissible testimony was prosecutorial misconduct that prejudiced him because the questions were designed to bolster the credibility of Amy and Katrina's statements that they had sex with Woods.
¶ 11. "It is well settled that when the trial judge sustains an objection to testimony and he directs the jury to disregard it, prejudicial error does not result." Pittman v. State, 928 So.2d 244, 250(¶ 12) (Miss.Ct.App.2006) (quoting Estes v. State, 533 So.2d 437, 439 (Miss.1988)). Here, the trial court sustained Woods's objections, but the court did not contemporaneously *1027 instruct the jury to disregard the testimony, nor was such instruction requested by Woods. Instead, when the jury was impaneled, the trial court gave them a preliminary instruction that "[i]f I say it's sustained, that means that I do agree with the objection and that would be not be presented to the jury." The trial court also gave jury instruction 1 stating that the jury should not speculate as to the answers to any questions which the court did not require to be answered or draw any inference from the content of those questions.
¶ 12. In Strahan v. State, 729 So.2d 800, 808(¶ 32) (Miss.1998), the defendant claimed he was prejudiced by certain testimony that assumed facts not in evidence. The trial court sustained an objection to the testimony, but refused to instruct the jury to disregard it. Id. at (¶ 31). However, at the conclusion of the evidence, the trial court gave a jury instruction stating, "You are to disregard all evidence which was excluded by the Court from consideration during the course of the trial." Id. at (¶ 34). On review, the supreme court noted that, although the judge did not instruct the jury to disregard the testimony until the close of evidence, the supreme court presumes as a matter of "institutional imperative" that jurors respect the law as they are instructed by the trial court and will follow a judge's instructions to disregard a witness's improper remarks. Id. at (¶ ¶ 35-36), Accordingly, the supreme court concluded that any prejudice caused by the testimony was cured because the objection was sustained and the jury was instructed to disregard the testimony. Id. at (¶ 37). In this case, the trial court gave a preliminary instruction stating that, when an objection is sustained, "that would not be presented to the jury," and also instructed the jury at the close of evidence that it should not speculate as to the answer to any question the court did not allow to be answered. We presume the jury followed the trial court's instructions and disregarded any testimony rendered after an objection to the testimony was sustained and did not speculate as to the answers to questions where the objection was sustained. This issue is without merit.
2. The trial court erred in refusing to allow the defense to play a prior consistent statement made by Amy.
¶ 13. Amy was called by the State but testified that she did not have sex with Woods. Primarily, the State's examination consisted of impeaching Amy with the prior inconsistent statements which she made in the note and to parents and authorities that she did have sex with Woods.[2] Amy maintained those statements were untrue. She said that she was "playing" when she wrote the note and that she gave the police statement in response to pressure from Deputy White. The State then brought out that Amy gave a videotaped statement to a defense investigator in January 2005 in which she denied having had sex with Woods. Amy testified that she recanted the allegations in January 2005 because she "couldn't go on saying it happened and it didn't." The prosecutor insinuated that *1028 Amy gave that statement in response to pressure from the defense investigator.
¶ 14. Amy again testified on cross-examination that she had been "playing" when she wrote the note and that she was pressured into giving the police statement by her parents and the authorities. Then, Woods attempted to introduce the videotaped statement to the defense investigator. The State objected to the admission of the tape because the interview included Amy's mother, as well as Amy, and because the tape was cumulative of Amy's testimony. The trial court excluded the taped statement as hearsay, but Woods proceeded to ask Amy about her statements on the tape. Amy stated that, on the tape, she had truthfully denied that the sex had occurred.
¶ 15. Woods argues that the taped statement was admissible under Mississippi Rule of Evidence 801(d)(1)(B), which provides that "a statement is not hearsay if . . . the declarant testifies at trial or hearing and is subject to cross-examination concerning the statement, and the statement is . . . consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive. . . ." This Court reviews the trial court's rulings on the admission or exclusion of evidence for abuse of discretion. Ladnier v. State, 878 So.2d 926, 933(¶ 27) (Miss.2004). An error in the admission or exclusion of evidence is not grounds for reversal unless the error affected a substantial right of a party. Id.; M.R.E. 103(a).
¶ 16. Here, Amy testified at the trial and was subject to cross-examination concerning the consistent statement. We must determine whether the statement was offered to "rebut an express or implied charge against [Amy] of recent fabrication or improper influence or motive." M.R.E. 801(d)(1)(B). Certainly, the State charged Amy with recent fabrication of her trial testimony. The prosecution implied that, in January 2005, Amy recanted the sex allegations under the improper influence of the defense investigator. In Owens v. State, 666 So.2d 814, 817 (Miss. 1995), the supreme court, relying on Tome v. United States, 513 U.S. 150, 160, 115 S.Ct. 696, 130 L.Ed.2d 574 (1995), held that:
"the language of [Rule 801(d)(1)(B)], in its concentration on rebutting charges of recent fabrication, improper influence and motive to the exclusion of other forms of impeachment, as well as in its use of wording which follows the language of the common-law cases, suggests that it was intended" to include the requirement that the consistent statements must have been made prior to the arising of the alleged motive to fabricate.
A prior consistent statement may not be introduced to "refute all forms of impeachment or merely to bolster a witness's credibility, but only to refute an alleged motive." Owens, 666 So.2d at 816 (citing Tome, 513 U.S. at 157, 115 S.Ct. 696). Under the prosecution's theory, Amy's motive to lie arose in January 2005 in response to the influence of the defense investigator. The videotape of the January 2005 statement to the defense investigator did not refute this alleged motive because the statements were not made before the alleged motive arose. Rather, the videotape's sole function was to bolster the credibility of Amy's trial testimony. The trial court correctly excluded the taped statement as hearsay.
3. The trial court erred in allowing the prosecution to cross-examine Amy with her grand jury testimony where the testimony was not provided to the defendant.
¶ 17. On re-direct, the State attempted to impeach Amy with her prior inconsistent *1029 statements to the grand jury. Woods objected based on a discovery violation because the State had not provided the defense with Amy's grand jury testimony. The trial court overruled the objection because grand jury testimony is not "traditionally transcribed around here." After being informed of her Fifth Amendment right against self-incrimination, Amy testified that she told the grand jury she had sex with Woods, but this had been a lie. No more of her grand jury testimony came into evidence.
¶ 18. Woods contends that Rule 9.04(A) of the Uniform Rules of Circuit and County Court Practice required the State to provide him with Amy's grand jury testimony and that the trial court erred by allowing the impeachment despite the discovery violation. Rule 9.04 governs discovery in criminal cases. Under Rule 9.04(A), not only must the State give to the defendant a copy of the contents of any witness statement "written, recorded or otherwise preserved," but the State must also disclose the substance of any oral statement by a witness to be offered by the prosecution at trial. In Harris v. State, 901 So.2d 1277, 1280(¶ 7) (Miss.Ct. App.2004), this Court recognized that this rule applies to grand jury testimony. While prior inconsistent statements used to impeach a witness are not discoverable under Rule 9.04 absent a request for disclosure, a prior inconsistent statement that is also used to bolster the substantive case of a party is subject to reciprocal discovery. Ross v. State, 954 So.2d 968, 999(¶ 63) (Miss.2007).
¶ 19. Rule 9.04(I)(1) provides that, if the prosecution at trial attempts to introduce evidence that was not properly disclosed to the defense, and the defense objects for that reason, the trial court must grant the defense "a reasonable opportunity to interview the newly discovered witness, [and] to examine the newly produced documents, photographs, or other evidence." After exercising the opportunity, the defense may claim unfair surprise or undue prejudice and seek a mistrial or a continuance. URCCC 9.04(I)(2). At that time, the trial court "shall, in the interest of justice or absent unusual circumstances, exclude the evidence or grant a continuance . . . or grant a mistrial." Id.
¶ 20. Amy's prior inconsistent statement to the grand jury that she had sex with Woods not only impeached her credibility, but also bolstered the State's substantive case against Woods. Therefore, regardless of whether Amy's grand jury testimony was transcribed, the State had an obligation under Rule 9.04(A)(1) to disclose the substance of Amy's grand jury testimony. See Ross, 954 So.2d at 999(¶ 63). However, the purpose of the discovery rules is to prevent trial by unfair surprise or ambush. Wimberly v. State, 839 So.2d 553, 560(¶ 29) (Miss.Ct.App. 2002). As noted by the State, Woods knew the basics of Amy's grand jury testimony and thus could not have been surprised by its contents. And, Amy's grand jury testimony that she had sex with Woods was but one of many prior inconsistent statements the State used to impeach Amy. Given the purpose of the rule and the relative insignificance of the impeachment of Amy with her grand jury testimony, the error was harmless. See id. at 561(¶ 34). This issue is without merit.
4. The trial court erred in allowing the prosecution to elicit hearsay.
¶ 21. Katrina testified she had sex with Woods. During the direct examination of Katrina, the State had her read from the note that started the investigation. Woods made a hearsay objection, and the trial court admitted Katrina's statements in the *1030 note as an exception to the hearsay rule to show Katrina's state of mind. The State also referred to the note during closing arguments. Woods argues that contents of the note were inadmissible hearsay and should have been excluded by the trial court.
¶ 22. The portions of the note read by Katrina contained her own statements acknowledging that the sex had occurred, as well as a relation of a subsequent conversation she had with Woods in which Woods admitted having had sex with the girls. Woods's statements acknowledging sex with the girls were admissions by a party-opponent and were admissible pursuant to Mississippi Rule of Evidence 801(d)(2)(A). Katrina's statements in the note were consistent with her testimony. Rule 801(d)(1)(B) provides that a statement is not hearsay if . . . "[t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is . . . consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive . . ." The State brought out that Katrina had recanted the sex allegations in a conversation with the defense investigator. Then, the State questioned Katrina about the contents of the note. The note contained her statements prior to the recantation that were consistent with her trial testimony and tended to rebut the notion that Katrina fabricated the allegations for trial. Therefore, her statements in the note were not hearsay and were admissible. This issue is without merit.
5. The prosecution committed misconduct when it vouched for its case in closing argument.
¶ 23. During closing arguments, the prosecution told the jury that, in most cases where the victim recants, the prosecution dismisses the case; but it did not do so in this case. Specifically, the prosecutor stated:
And it is like I said, we could have easily dismissed this case. We wouldn't have had to fight so hard for those two girls who didn't want to be here to start with. A lot of times when people change their stories, or when somebody goes and gets a whole brand new statement from somebody and they recant their story and say, oh, this didn't happen, a lot of times the State of Mississippi say, okay, then we going to dismiss it. But it's because of the circumstances of how and where those statements were taken and the victims recanted their stories that the State of Mississippi in this case says, no; we are not going to roll over like this and let this 51-year-old man get away with having sexual intercourse with no 14-year-old regardless of what she wanted. It would have been so easy to write this little motion. "Judge, we hereby move, the State of Mississippi to dismiss the case against Arthur Woods," and we need your signature, and we could have all gone home. What he did was wrong. It's not only wrong; it's a violation of the law.
Woods contends the prosecution improperly vouched for the merits of its case.
¶ 24. The statements of which Woods complains `did bolster the veracity of the girls' allegations by implying that the State would not have pursued the case but for the circumstances under which the initial allegations were made, i.e., in the note passed between the girls, and the circumstances under which they were recanted, i.e., in the girls' statements to the defense investigator. There was, however, no objection raised to the statements during closing arguments. As Woods did not contemporaneously object, this issue is *1031 procedurally barred. Rubenstein v. State, 941 So.2d 735, 779 (¶ 190) (Miss.2006). We observe that the supreme court has declined to view bolstering statements by the prosecution during closing arguments as plain error requiring reversal. Id. (citing United States v. Young, 470 U.S. 1, 20, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985)).
6. The evidence is insufficient to support the verdict or, in the alternative, the verdict is against the overwhelming weight of the evidence.
¶ 25. Woods argues that the trial court erred by denying his motion for a JNOV or a new trial. A motion for a JNOV attacks the sufficiency of the evidence. On review of the denial of a JNOV, "the critical inquiry is whether the evidence shows `beyond a reasonable doubt that accused committed the act charged, and that he did so under such circumstances that every element of the offense existed; and where the evidence fails to meet this test it is insufficient to support a conviction.'" Bush v. State, 895 So.2d 836, 843(¶ 16) (Miss.2005) (quoting Carr v. State, 208 So.2d 886, 889 (Miss.1968)). We view the evidence in the light most favorable to the State, and will affirm if any reasonable trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Id. "Matters regarding the weight and credibility to be accorded the evidence are to be resolved by the jury." Harveston v. State, 493 So.2d 365, 370 (Miss.1986).
¶ 26. The elements of statutory rape are met when a person seventeen years of age or older has sexual intercourse with a child over the age of fourteen but under the age of sixteen, if the child is thirty-six or more months younger than the person and is not the person's spouse. Miss.Code Ann. § 97-3-65(1)(a)(i)-(iii) (Supp.2007). The totally uncorroborated testimony of a sex crime victim is sufficient to support a guilty verdict where it is consistent with the circumstances and is not discredited or contradicted by other credible evidence. Green v. State, 887 So.2d 840, 845(¶ 13) (Miss.Ct. App.2004). A sex crime victim's testimony is corroborated by the victim's physical and mental condition after the alleged incident and by the victim's immediate reporting of the incident. Vaughn v. State, 759 So.2d 1092, 1098(¶ 18) (Miss.1999).
¶ 27. Woods argues that Katrina's testimony that she had sex with him was uncorroborated, was cast into doubt by her prior recantation, and for those reasons was insufficient to support his conviction of statutory rape. He avers that Katrina's statement that her stepmother would make her leave home if she did not testify against Woods further showed that her credibility was compromised. Viewing the evidence in the light most favorable to the verdict, we find that the evidence was sufficient to enable a reasonable jury to find Woods guilty of statutory rape. Katrina gave detailed testimony about her sexual encounter with Woods. It was undisputed that Katrina was present at Woods's home at the time the statutory rape was to have occurred. Though Katrina did not immediately report the incident to the authorities, she did discuss it with Amy in a note written five days after the incident. And, Katrina's denial of the allegations to the defense investigator and statements about her stepmother's threats did not so thoroughly discredit or contradict her testimony that a reasonable jury could not have concluded that she had sex with Woods.
¶ 28. A motion for a new trial challenges the weight of the evidence. On review of the denial of a motion for a new trial, we view the evidence in the light most favorable to the verdict, and determine whether the evidence so heavily preponderated *1032 against the verdict that an unconscionable injustice would result from the denial of a new trial. Bush 895 So.2d at 844(¶ 18). The power to grant a new trial should be exercised only in exceptional cases. Id. Considering the evidence referenced in our discussion of the sufficiency of the evidence, the evidence did not preponderate so heavily against the verdict that an unconscionable injustice would result without a new trial. These issues are without merit.
7. The errors taken together are cause for a new trial.
¶ 29. Woods argues that this Court should find that the individual errors that occurred in this case, when considered cumulatively, amount to reversible error. It is within this Court's discretion to determine whether errors, found to be harmless in themselves, "when considered cumulatively require reversal because of the resulting cumulative prejudicial effect." Glasper v. State, 914 So.2d 708, 729(¶ 46) (Miss.2005) (quoting Byrom v. State, 863 So.2d 836, 847(¶ 13) (Miss.2003)). The application of the cumulative error analysis necessitates our finding that multiple errors occurred in the proceedings below. Id. The only error that occurred in Woods's trial was the trial court's failure to recognize and address the State's discovery violation, an error which we have found to be harmless. There are no other errors which we could evaluate in aggregation with this single error for resulting cumulative prejudicial effect. Therefore, this issue is without merit.
¶ 30. THE JUDGMENT OF THE CIRCUIT COURT OF LEFLORE COUNTY OF CONVICTION OF STATUTORY RAPE AND SENTENCE OF THIRTY YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., MYERS, P.J., IRVING, BARNES AND CARLTON, JJ., CONCUR. ROBERTS, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY LEE, P.J., GRIFFIS AND ISHEE, JJ.
ROBERTS, J., Dissenting:
¶ 31. Based on my careful review of the record in this case, I find that the totally uncorroborated testimony of the sex crime victim, Katrina, has in fact been discredited, impeached, and contradicted by other credible evidence. Therefore, I am compelled to dissent.[3] Our precedent teaches us that in such a case we are required to reverse. Mabus v. State, 809 So.2d 728, 732(¶ 19) (Miss.Ct.App.2001). See also Upton v. State, 192 Miss. 339, 341, 6 So.2d 129, 129 (1942) (reversed and remanded for a new trial based on the victim's discredited testimony); Johnson v. State, 213 Miss. 808, 813, 58 So.2d 6, 8 (1952). Accordingly, I would reverse and remand the case for a new trial.
¶ 32. Our standard of review of a denial of a motion for new trial has recently been stated as such:
[w]hen reviewing a denial of a motion for a new trial based on an objection to the weight of the evidence, we will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice. We have stated that on a motion for new trial, the court sits as a thirteenth juror. *1033 The motion, however, is addressed to the discretion of the court, which should be exercised with caution, and the power to grant a new trial should be invoked only in exceptional cases in which the evidence preponderates heavily against the verdict. However, the evidence should be weighed in the light most favorable to the verdict. A reversal on the grounds that the verdict was against the overwhelming weight of the evidence, "unlike a reversal based on insufficient evidence, does not mean that acquittal was the only proper verdict." Rather, as the "thirteenth juror," the court simply disagrees with the jury's resolution of the conflicting testimony. This difference of opinion does not signify acquittal any more than a disagreement among the jurors themselves. Instead, the proper remedy is to grant a new trial.
Jones v. State, 962 So.2d 1263, 1277(¶ 54) (Miss.2007) (quoting Bush v. State, 895 So.2d 836, 844(¶ 18) (Miss.2005)) (internal citations omitted).
¶ 33. The pertinent facts of the case will be briefly addressed for emphasis. On the night of October 10, 2003, Amy was spending the night at Katrina's house. Amy was fifteen years old at the time, and Katrina was fourteen years old.[4] The two girls surreptitiously exited Katrina's bedroom after her parents had gone to sleep. They went across the street to Woods's residence apparently to engage in sex.
¶ 34. Katrina testified at trial that she and Amy went to Woods's house the night of October 10, and each of them had sex with. Woods twice. This was the only direct evidence the jury could have considered in their finding of guilt, and Katrina was impeached by her own out-of-court statements. Prior to trial, she signed a sworn statement claiming that neither she nor Amy had ever had sexual relations with Woods. Additionally, in November 2004 she gave a taped statement to defense counsel's investigator in which she stated Woods never touched her and she had never had sex with anyone over the age of thirty. On October 10, 2003, Woods was fifty-one years old. Lastly, although she and her step-mother denied it on the stand, Amy's mother testified that Katrina asked if she could stay with Amy because her step-mother told her if she did not say she had sex with. Woods she was going to kick her out of the house. Amy's mother told Katrina to tell the truth, and Katrina responded that if she told the truth she would have nowhere to live.
¶ 35. Standing in direct contradiction to Katrina's version of events was the testimony of Amy, an alleged participant who testified that Woods did not have sex with the two girls. As with Katrina, Amy's veracity was also called in question as she initially gave a statement to the police indicating that the two girls did have sex with Woods. However, as to the motive for this statement, Amy stated that her mother repeatedly claimed that she was going to "whup" Amy if she did not say she had sex with Woods. Similarly, Amy's mother testified that she asked Amy several times if she had sex with Woods, and Amy consistently responded in the negative. However, she testified that at some point Amy responded, "if I tell you this happened you will leave me alone?" Her statement to the police soon followed.
¶ 36. Amy also testified that, while she and Katrina did not have sex with Woods, they did visit his home at approximately 10:00 p.m. on the night of October 10, 2003. She further specified that individuals *1034 identified as Willie Ray and Curtis Johnson accompanied the pair to Woods's home. She stated that they all watched television and then left. Johnson also testified and corroborated Amy's version of events, although he could not be certain of the actual date of the visit.
¶ 37. Additionally, Woods's long-time girlfriend testified that she was at Woods's house the night of October 10, 2003. She also stated that, at around 10:00 or 11:00 p.m. on October 10, she was in Woods's bedroom when she heard male and female voices coming from the front of the house; but she never saw who it was. She testified that, no one else, other than her and Woods, were in the bedroom.
¶ 38. In my humble opinion, based on the facts of the case before us and the evidence against Woods, allowing the verdict to stand would be tantamount to sanctioning an unconscionable injustice. Neither the note confiscated from Katrina and Amy nor Amy's initial statement, admitting the statutory rape, were admitted into evidence. Therefore, neither could be considered by the jury as substantive evidence on Woods's guilt, but only considered as impeachment evidence of a prior inconsistent statement. We are then left with the completely uncorroborated testimony of Katrina that she and Amy had sex with Woods the night of October 10, 2003. Contradicting this testimony are Katrina's own prior statements that include her sworn statement disclaiming the rape occurred, a taped statement indicating she had never had sexual relations with anyone over thirty years old, and her plea to Amy's mother for a roof over her head if she told the truth in court. Further contradicting evidence include: (1) Amy's in-court testimony that the statutory rape never happened, (2) the testimony of Woods's girlfriend that she was in his bedroom the night of October 10, 2003, and, (3) Johnson's testimony that he accompanied the girls to Woods's house, even though he was unsure of the date.
¶ 39. I am acutely aware of the solemn duty of members of a jury to hear the evidence before them and make a determination of guilt or innocence based upon the law of this State and their belief in what the truth is. However, it is my opinion, as the "thirteenth juror," that the jury in this case simply came to the wrong conclusion based upon the evidence before it. The trial judge sentenced Woods to the maximum sentence of thirty years for statutory rape, a crime for which Woods is not eligible for parole, early release, or earned time. See Miss.Code Ann. §§ 47-5-139(1)(d), 47-7-3(1)(b) (Rev.2004). It is my considered opinion that the weight of the evidence against Woods simply does not support the verdict reached by the jury. Therefore, I find that the trial judge abused his discretion in denying Woods's motion for a new trial. Accordingly, I must respectfully dissent as I would reverse the judgment of the trial court and remand this case to the trial court for a new trial.
LEE, P.J., GRIFFIS AND ISHEE, JJ., JOIN THIS OPINION.
ROBERTS, J., Dissenting:
¶ 40. Based on my careful review of the record in this case, I find that the totally uncorroborated testimony of the sex crime victim, Katrina, has in fact been discredited, impeached, and contradicted by other credible evidence. Therefore, I am compelled to dissent.[5] Our precedent teaches *1035 us that in such a case we are required to reverse. Mabus v. State, 809 So.2d 728, 732(¶ 19) (Miss.Ct.App.2001). See also Upton v. State, 192 Miss. 339, 341, 6 So.2d 129, 129 (1942) (reversed and remanded for a new trial based on the victim's discredited testimony); Johnson v. State, 213 Miss. 808, 813, 58 So.2d 6, 8 (1952). Accordingly, I would reverse and remand the case for a new trial.
¶ 41. Our standard of review of a denial of a motion for new trial has recently been stated as such:
[w]hen reviewing a denial of a motion for a new trial based on an objection to the weight of the evidence, we will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice. We have stated that on a motion for new trial, the court sits as a thirteenth juror. The motion, however, is addressed to the discretion of the court, which should be exercised with caution, and the power to grant a new trial should be invoked only in exceptional cases in which the evidence preponderates heavily against the verdict. However, the evidence should be weighed in the light most favorable to the verdict. A reversal on the grounds that the verdict was against the overwhelming weight of the evidence, "unlike a reversal based on insufficient evidence, does not mean that acquittal was the only proper verdict." Rather, as the "thirteenth juror," the court simply disagrees with the jury's resolution of the conflicting testimony. This difference of opinion does not signify acquittal any more than a disagreement among the jurors themselves. Instead, the proper remedy is to grant a new trial.
Jones v. State, 962 So.2d 1263, 1277(¶ 54) (Miss.2007) (quoting Bush v. State, 895 So.2d 836, 844(¶ 18) (Miss.2005)) (internal citations omitted).
¶ 42. The pertinent facts of the case will be briefly addressed for emphasis. On the night of October 10, 2003, Amy was spending the night at Katrina's house. Amy was fifteen years old at the time, and Katrina was fourteen years old.[6] The two girls surreptitiously exited Katrina's bedroom after her parents had gone to sleep. They went across the street to Woods's residence apparently to engage in sex.
¶ 43. Katrina testified at trial that she and Amy went to Woods's house the night of October 10, and each of them had sex with Woods twice. This was the only direct evidence the jury could have considered in their finding of guilt, and Katrina was impeached by her own out-of-court statements. Prior to trial, she signed a sworn statement claiming that neither she nor Amy had ever had sexual relations with Woods. Additionally, in November 2004 she gave a taped statement to defense counsel's investigator in which she stated Woods never touched her and she had never had sex with anyone over the age of thirty. On October 10, 2003, Woods was fifty-one years old. Lastly, although she and her step-mother denied it on the stand, Amy's mother testified that Katrina asked if she could stay with Amy because her step-mother told her if she did not say she had sex with Woods she was going to kick her out of the house. Amy's mother told Katrina to tell the truth, and Katrina responded that if she told the truth she would have nowhere to live.
¶ 44. Standing in direct contradiction to Katrina's version of events was the testimony of Amy, an alleged participant who *1036 testified that Woods did not have sex with the two girls. As with Katrina, Amy's veracity was also called in question as she initially gave a statement to the police indicating that the two girls did have sex with Woods. However, as to the motive for this statement, Amy stated that her mother repeatedly claimed that she was going to "whup" Amy if she did not say she had sex with Woods. Similarly, Amy's mother testified that she asked Amy several times if she had sex with Woods, and Amy consistently responded in the negative. However, she testified that at some point Amy responded, "if I tell you this happened you will leave me alone?" Her statement to the police soon followed.
¶ 45. Amy also testified that, while she and Katrina did not have sex with Woods, they did visit his home at approximately 10:00 p.m. on the night of October 10, 2003. She further specified that individuals identified as Willie Ray and Curtis Johnson accompanied the pair to Woods's home. She stated that they all watched television and then left. Johnson also testified and corroborated Amy's version of events, although he could not be certain of the actual date of the visit.
¶ 46. Additionally, Woods's long-time girlfriend testified that she was at Woods's house the night of October 10, 2003. She also stated that, at around 10:00 or 11:00 p.m. on October 10, she was in Woods's bedroom when she heard male and female voices coming from the front of the house; but she never saw who it was. She testified that no one else, other than her and Woods, were in the bedroom.
¶ 47. In my humble opinion, based on the facts of the case before us and the evidence against Woods, allowing the verdict to stand would be tantamount to sanctioning an unconscionable injustice. Neither the note confiscated from Katrina and Amy nor Amy's initial statement, admitting the statutory rape, were admitted into evidence. Therefore, neither could be considered by the jury as substantive evidence on Woods's guilt, but only considered as impeachment evidence of a prior inconsistent statement. We are then left with the completely uncorroborated testimony of Katrina that she and Amy had sex with Woods the night of October 10, 2003. Contradicting this testimony are Katrina's own prior statements that include her sworn statement disclaiming the rape occurred, a taped statement indicating she had never had sexual relations with anyone over thirty years old, and her plea to Amy's mother for a roof over her head if she told the truth in court. Further contradicting evidence include: (1) Amy's in-court testimony that the statutory rape never happened, (2) the testimony of Woods's girlfriend that she was in his bedroom the night of October 10, 2003, and, (3) Johnson's testimony that he accompanied the girls to Woods's house, even though he was unsure of the date.
¶ 48. I am acutely aware of the solemn duty of members of a jury to hear the evidence before them and make a determination of guilt or innocence based upon the law of this State and their belief in what the truth is. However, it is my opinion, as the "thirteenth juror," that the jury in this case simply came to the wrong conclusion based upon the evidence before it. The trial judge sentenced Woods to the maximum sentence of thirty years for statutory rape, a crime for which Woods is not eligible for parole, early release, or earned time. See Miss.Code Ann. §§ 47-5-139(1)(d), 47-7-3(1)(b) (Rev.2004). It is my considered opinion that the weight of the evidence against Woods simply does not support the verdict reached by the jury. Therefore, I find that the trial judge abused his discretion in denying Woods's motion for a new trial. Accordingly, I *1037 must respectfully dissent as I would reverse the judgment of the trial court and remand this case to the trial court for a new trial.
LEE, P.J., GRIFFIS AND ISHEE, JJ., JOIN THIS OPINION.
NOTES
[1] The names of the minor children have been changed to protect their identities in this sex crime appeal.
[2] It, appears likely that the State called Amy for the primary purpose of impeaching her with her prior inconsistent statements in order to avoid the hearsay rule. See Flowers v. State, 773 So.2d 309, 326(¶ 58) (Miss.2000). Presumably, Woods's decision not to object to Amy's testimony on this ground was a strategic one, as Amy's recantation of the allegations both favored the defense and cast doubt upon the truthfulness of both girls' allegations against Woods. The court did give a limiting instruction restricting the jury from considering the, prior inconsistent statements as substantive evidence of guilt. The court's dismissal of the statutory rape charge involving Amy obviates the need for further discussion of this issue.
[3] In an effort to maintain uniformity the same pseudonyms have been used in place of the minors' names.
[4] The testimony at trial provided that Amy turned sixteen two months later on December 22nd and Katrina turned fifteen on December 18th.
[5] In an effort to maintain uniformity the same pseudonyms have been used in place of the minors' names.
[6] The testimony at trial provided that Amy turned sixteen two months later on December 22nd and Katrina turned fifteen on December 18th.